CLARA B. PARKER, EXECUTRIX OF THE ESTATE OF GEORGE D. PARKER, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58604. Promulgated November 21, 1934.

*Thomas R. Dempsey, Esq.*, *A. Calder Mackay, Esq.*, *Arthur McGregor, Esq.*, and *Wm. C. Kottemann, C. P. A.*, for the petitioner.
*Richard W. Wilson, Esq.*, for the respondent.

OPINION.

SEAWELL: (1) The first error assigned is that the respondent failed to allow the decedent to carry forward and deduct from 1928 income an alleged net loss of $55,231.83 sustained by the decedent in his business in 1927.

It is not disputed that in 1927 and prior years (1920–1927, inclusive) the decedent, George D. Parker, advanced to the Parker Lumber & Box Co. $192,843.34, which amount in 1927 he wrote off his books as a worthless or bad debt and claimed the same as a deduction in his return for the year 1927, which was allowed by the respondent. It is alleged in the amended petition that this charge-off resulted " in a net loss for the year 1927 which the respondent has erroneously and illegally failed to allow as a deduction from 1928 income in accordance with the provisions of section 117 of the Revenue Act of 1928."

The respondent admits that the decedent sustained a loss in 1927 as stated, but he insists the decedent is not, in the circumstances of the instant case, entitled to have same carried forward and deducted as a net loss in the computation of his tax liability for 1928 as claimed by petitioner. The respondent contends that the loaning or advancing of $192,843.34 to the Parker Lumber & Box Co. did not, under the circumstances shown, constitute the operation of a trade or business regularly carried on by decedent, and, such being true, no net loss for 1927, within the meaning of the Revenue Act of 1928, section 117 or any of its subsections, resulted, as petitioner insists.

In behalf of the petitioner it is argued that the large advances made by the decedent to the Parker Lumber & Box Co. over a

period of years were not merely isolated or occasional transactions, but were so numerous, constant, and closely connected with his own private and individual business as to constitute such a part of his trade or business. We, however, think differently and are of the opinion and hold that on this issue the decision in *Burnet* v. *Clark*, 287 U. S. 410, is controlling, and that the loaning or advancing of money by the decedent Parker to the Parker Lumber & Box Co., which occasioned or resulted in the loss of $192,843.34 to Parker, under the circumstances disclosed by the record, did not, within the meaning of the Revenue Act of 1928, constitute the operation by the decedent of a trade or business regularly carried on. See also *Joseph Cavedon*, 30 B. T. A. 364. Cf. *Ames* v. *Commissioner*, 68 Fed. (2d) 301; certiorari denied, 292 U. S. 635.

Notwithstanding the allegations in the amended petition as to the loss and charge-off on his books in 1927 of the $192,843.34 by the decedent and a bad debt deduction taken therefor in his 1927 return and allowed by the respondent, on brief in behalf of the petitioner it is argued that the facts show the losses on the aforesaid advancements to the Parker Lumber & Box Co. were sustained during 1928 and should be allowed as deductions in that year. That such were not so allowed by the respondent is not, however, assigned as error. In the light of the facts shown by the record, we are of the opinion and hold, as heretofore indicated, that in dealing with the alleged loss by the decedent of $192,843.34 the respondent did not commit error and his action in refusing to allow the alleged net loss of $55,231.83, or any part thereof, to be carried forward as a deduction from 1928 income, is approved.

(2) The second assignment of error is based on the fact of the failure of the respondent to recognize George D. Parker Co. for the years 1928 and 1929 as a five-party partnership, the respondent continuing, as in prior years, to deal with it as a two-party partnership, in which George D. Parker had a two-thirds interest and C. E. Brown a one-third interest.

Having, in the heretofore-mentioned consolidated cases, held that George D. Parker Co. was a five-party partnership and the record showing that the same during the years now in issue was in process of liquidation and that the increase by respondent of decedent's net taxable income from the partnership in said years was due to considering and computing Parker's partnership interest as being two thirds instead of one fourth, as it really was under the five-party partnership agreement, we are of the opinion and hold that the respondent erred as alleged in the second assignment of error and his determinations increasing the decedent's net taxable income from the partnership in the amounts of $1,402.09 and $1,204.90 for the years 1928 and 1929, respectively, are disapproved.

(3) With respect to the third assignment of error, the record shows that George D. Parker considered the aforesaid cost of his stock in the Parker Lumber & Box Co. plus certain other items (consisting of certain oil stock, abandoned oil lease, etc.), aggregating $67,426.68, as a total loss in 1928 and in his return for that year treated the property on which loss was asserted as community property, deducting as a loss on "worthless stocks and oil leases" one half of the total cost thereof, or the amount of $33,713.34.

It is insisted by the respondent that such stock became worthless prior to 1928, to wit, in 1927, and at that time must have been so known to the decedent.

It has been shown that the decedent claimed and was allowed a loss of $192,843.34 in 1927, that amount representing unpaid and unsecured advances made by the decedent to the Parker Lumber & Box Co. The record shows that the decedent purchased in October 1927, at the sheriff's sale, under judgment he obtained upon foreclosure of the aforesaid mortgages on the company's property, substantially all the corporate assets, which in the amended petition are alleged to have been of a fair market value of not exceeding $100,000. Under such circumstances, taken in connection with other facts shown in the record, it appears to us that it must have been apparent to the decedent Parker at the time of the sale by the sheriff that the equity of redemption in the property, having a value of only $100,000, which was sold and bid in to satisfy a judgment of $240,375.75, was worth nothing and that there was no basis for a reasonable belief that he would ever realize anything on his stock; that it was then evident that his stock was as worthless as his claim of $192,843.34 for advances, which was charged off by him as a worthless debt in 1927 and allowed as such by the respondent.

In our opinion, and we so hold, the aforesaid third assignment of error is not sustained by any evidence sufficient to overcome the presumption of the correctness of the respondent's determination in reference to the alleged loss and in adding the sum of $8,481.77 to the decedent's income for 1928 as an overstatement of loss, and respondent's action in so doing is approved.

(4) and (5) Errors four and five raise the issue whether or not the respondent committed error in refusing to allow the decedent to include in his returns for 1928 and 1929 only one half of the total gross income actually received by him during those years. It is not disputed that for 1928 and 1929 the decedent and his wife filed separate returns, each returning one half of the asserted income received by the decedent, on the theory that all income received by the decedent was community property.

The respondent refused to allow such division, with the single exception of salary of the decedent for services at the Parker Machine

Works, amounting to $6,000, and added to decedent's gross income the one half of such income which was reported by his wife.

Petitioner's ultimate contention with respect to these two assignments of error is that the respondent has overstated decedent's income for the year 1928 by $39,413, and has overstated decedent's income for the year 1929 by $39,183.97, by failing to recognize petitioner's contention that these amounts represented the wife's share of community income for those years.

It is now well settled that since July 29, 1927, divisible community income of California husband and wife taxpayers is limited to income from community property acquired after July 29, 1927, and to all salaries, wages, and fees earned by either spouse on and after that date. See section 161 a, Civil Code of California, effective July 29, 1927; *United States* v. *Malcolm*, 282 U. S. 792; *Hirsch* v. *United States*, 62 Fed. (2d) 128; certiorari denied, 289 U. S. 735; *Helen N. Winchester, Administratrix*, 27 B. T. A. 798; and *Gouverneur Morris*, 31 B. T. A. 178.

Petitioner, in setting forth her contention that decedent's income for 1928 and 1929 is overstated by the amounts of $39,413 and $39,183.97, respectively, does not take issue with the proposition of law, as stated in the previous paragraph. In fact, she has to rely upon that proposition in order to sustain her position.

Petitioner's proposition is that in California, on and after July 29, 1927, where income which the husband receives from a business in which either his separate property or community property acquired prior to July 29, 1927, is invested is the result of both (1) such investment and (2) his own personal services, then such income should be segregated and apportioned between the two sources, with the result that all income which is essentially attributable to such investment should be taxed to the husband, and all income which is essentially attributable to his services should be taxed equally to the husband and wife as community property.

This is practically the same question as was before the Board in *Julius Shafer*, 2 B. T. A. 640, which, however, involved the law of the State of Washington rather than California. There the closing paragraph of our opinion was as follows:

Summarizing our decision, it is that, under the laws of the State of Washington, income arising in part from separate property and in part from community effort should be apportioned; that where an apportionment has been made by the taxpayer which the Commissioner accepts and which appears to be reasonable, such apportionment will not be disturbed.

In G. C. M. 9825 (X-2 C. B. 146) the General Counsel, in an extended opinion on the proper method of determining the earned income credit provided for by section 31 of the Revenue Act of 1928,

when the income was derived from a combination of personal services and capital, in part, said:

In California the situation is complicated by the construction placed on the community property laws by the courts of that State. It has been held that inasmuch as the income from a partnership between the husband and a third party was in part attributable to his separate capital and in part to his personal labor or effort, such part of the profit as accrues from the use of capital is separate property and such part as is due to the personal activity, ability, and capacity of the husband is community property. (*Pereira* v. *Pereira*, 156 Cal., 1, 103 Pac., 488; *McDuff* v. *McDuff*, 48 Cal. A., 175, 191 Pac., 957; *In re Gold's Estate*, 170 Cal., 621, 151 Pac., 12.) In *Pereira* v. *Pereira*, in discussing the apportionment of income between that part attributable to the use of the capital of the husband and that part attributable to the activity, ability, and capacity of the husband, the supreme court of the State used the following language:

> * * * The separate property should have been credited with some amount as profit on this capital. It was not a losing business, but a very profitable one. It is true that it is very clearly shown that the principal part of the large income was due to the personal character, energy, ability, and capacity of the husband. This share of the earnings was, of course, community property; but without capital he could not have carried on the business. In the absence of circumstances showing a different result, it is to be presumed that some of the profits were justly due to the capital invested. There is nothing to show that all of it was due to defendant's efforts alone. The probable contribution of the capital to the income should have been determined from all the circumstances of the case, and, as the business was profitable, *it would amount at least to the usual interest on a long investment well secured.* * * * [Italics supplied.]

Furthermore, the Supreme Court of California in *In re Gold's Estate* stated as follows:

> The plaintiffs claim that Gold's share of the partnership profits made after the marriage became Gold's separate property by reason of the fact that the partnership was formed prior to the marriage. Where a business has been carried on and capital has been invested therein before marriage, the entire profits therefrom, after marriage, are not necessarily separate property of the husband. The rules regarding the character of such property were considered in *Pereira* v. *Pereira* (156 Cal., 1, 103 Pac., 488, 23 L. R. A. (N. S.), 880, 134 Am. St. Rep., 107.) The principle there stated is that the interest of the husband in the capital of the partnership, as it was at the time of his marriage, is the husband's separate property, and that the question what part of the subsequent profits arises from the use of this capital and what part from the personal activity, ability, and capacity of the husband is to be determined by the court from the circumstances appearing in the case, that whatever accrues from the latter source is community property, and that the remaining profits must be classed as separate estate. * * *

It is necessary, therefore, in the audit of returns in the State of California, where the husband is a member of a partnership in which both personal services and capital are income-producing factors (and the wife is not a member of the partnership), that effect be given to section 31 of the Revenue Act of 1928 and to the law of the State as set forth in the court decisions referred to above. * * *

Cf. *Rucker* v. *Blair*, 32 Fed. (2d) 222; *Anna L. Compton, Executrix*, 11 B. T. A. 26.

The evidence indicates that the average capital investment in the decedent's box-nailing machine business operated under the name of Parker Machine Works for 1928 and 1929 was $170,870.12 and $208,036.63, respectively; and that the net business income for those years was $90,786.91 and $92,930.51, respectively. It is also shown that a return of 7 percent would be a fair return on the capital investment in that business and that $6,000 was reasonable compensation for decedent's services in each of said years.

With respect to assignments of error four and five, we are of the opinion and hold, therefore, that the total net business income of each of the years 1928 and 1929 should be apportioned on the basis of a fair return on decedent's said investment and his reasonable compensation of $6,000 as above indicated, in accordance with the method outlined in G. C. M. 9825, *supra*, which we think is based on the correct principle and should be computed, as follows:

### For the year 1928

$\frac{11,960.91}{17,960.91}$ of $90,786.91 equals $60,458.74, or the amount essentially attributable to decedent's investment.

$\frac{6,000.00}{17,960.91}$ of $90,786.91 equals $30,328.17, or the amount essentially attributable to the personal services rendered by the decedent, and, therefore, community income.

| | |
|---|---|
| Correct community income | $30,328.17 |
| Amount determined by respondent as community income | 6,000.00 |
| Additional community income | 24,328.17 |
| ½ taxable to the wife | 12,164.09 |

### For the year 1929

$\frac{14,562.56}{20,562.56}$ of $92,930.51 equals $70,677.30, or the amount essentially attributable to decedent's investment.

$\frac{6,000.00}{20,562.56}$ of $92,930.51 equals $22,253.21, or the amount essentially attributable to the personal services rendered by decedent, and, therefore, community income.

| | |
|---|---|
| Correct community income | $22,253.21 |
| Amount determined by respondent | 6,000.00 |
| Additional community income | 16,253.21 |
| ½ taxable to the wife | 8,126.61 |

(6) In reference to the sixth assignment of error little need be said. It is undisputed that the decedent during the years in issue was engaged in a trade or business in which both personal service and capital investment are material income-producing factors and

under such circumstances, in computing earned income credit to the decedent, he was limited to the 20 percent allowance provided in section 31 (a) (1), (2), (3) and (b) of the Revenue Act of 1928. The respondent's deficiency notice shows a credit of 25 percent for earned net income in the amount of $245.14 for the year 1928 and in the amount of $335.82 for 1929. These earned income credits result from the respondent's determination that earned net income of the decedent in the year 1928 was $21,555.63, or 20 percent of a net income from business of $107,778.14, and that earned net income for the year 1929 was $26,884.20, or 20 percent of a net income from business of $134,421.01. The petitioner insists that earned income credit for each year should be based on earned income of at least $30,000. The computation of net income as made by the respondent, resulting in earned income credits for 1928 and 1929 in the respective amounts stated, is not in evidence, nor does the record show wherein the respondent committed error in his computations, if error was made therein.

In our opinion and we so hold, the evidence in the record is not sufficient to overturn the presumption of the correctness of the respondent's determination with respect to earned income credits.

(7) and (8) Relative to assignments of error seven and eight, there is no reference nor argument made in petitioner's brief to sustain same and in our view no evidence adduced overcoming the presumption of the correctness of the respondent's determination in reference thereto. Therefore, we are of the opinion and hold that as regards those assignments the determinations of the respondent are correct and his action is accordingly approved.

(9) The decedent and Fred Stebler organized the Stebler-Parker Co. about 1921. Each of them acquired 50 percent of the corporation's stock. The decedent's basis of his 1,125 shares (exclusive of the $10,000 paid by him in 1922 to George X. Wendling for services in the matter of the organization of the Stebler-Parker Co.) was $112,500. The John Bean Manufacturing Co. (name later changed to Food Machinery Corporation) was organized about 1928 for the purpose of acquiring the business of several corporations.

In 1929 the John Bean Manufacturing Co. acquired all the capital stock of the Stebler-Parker Co. from decedent and Stebler (including certain patents owned by decedent, but which pertained to the business of Stebler-Parker Co.) for 14,000 shares of its own common stock and $51,674.42 in cash. Decedent's basis for the patents owned by him was $1,114.73. Decedent received 6,500 shares of the common stock of the John Bean Manufacturing Co. and all the cash of $51,674.42; Stebler received the remaining 7,500 shares of stock. Respondent determined and contends that decedent realized a profit on the transaction of $263,059.69, as set forth in our findings of fact.

Petitioner contends that (1) no gain whatever should be recognized because the transaction was "well within section 112 of the Revenue Act of 1928"; (2) that if held not to be within section 112, then no gain whatever should be recognized because decedent was under a gentleman's agreement not to sell any of the 6,500 shares during 1928, 1929, or 1930, which agreement precluded the stock from having any fair market value; and (3) that in any event the stock did not have a fair market value in 1929 in excess of $20 per share.

The record does not show whether the John Bean Manufacturing Co. took over the assets of the Stebler-Parker Co. and dissolved it or whether the latter company continued in existence. The facts in the instant case with respect to the transaction by which the John Bean Manufacturing Co. acquired all the stock of the Stebler-Parker Co. are analogous to the facts in *John J. Watts*, 28 B. T. A. 1056, and, in accordance with our determination therein, we are of the opinion and hold that the transaction by which the John Bean Manufacturing Co. acquired the stock of Stebler-Parker Co. did not constitute a reorganization within the meaning of section 112 (i) (1) of the Revenue Act of 1928, as insisted in behalf of the petitioner. See also *A. L. Miller*, 29 B. T. A. 1061; *A. T. Evans*, 30 B. T. A. 746; *Alice V. St. Onge*, 31 B. T. A. 295. Cf. *C. H. Mead Coal Co.* v. *Commissioner*, 72 Fed. (2d) 22; *W. C. Coleman*, 31 B. T. A. 319.

The written agreement of May 3, 1929, discloses that the parties thereto were contemplating an exchange on a basis of the stock of the John Bean Manufacturing Co. having a then fair market value of $50 per share.

It is undisputed that the terms and provisions of the written agreement of May 3, 1929, were carried out. That agreement contains a provision with respect to placing the stock to be received by Stebler and the decedent in escrow. The escrow agreement, assuming that it was in fact executed, was not introduced in evidence at the hearing. Whether such an instrument, if executed, contained any clause with respect to a restriction on the sale of the John Bean Manufacturing Co. stock is not shown, but it is apparent that the escrow agreement, whatever its terms may have been, terminated not later than September 15, 1929, as specifically provided in the agreement of May 3, 1929.

The intention of the parties to the agreement is clearly disclosed, and the purpose sought to be accomplished by the contract is free from any ambiguity. If there was in fact any understanding intended to be absolutely binding on the parties to the agreement to the effect that no sale of John Bean Manufacturing Co. stock

should be made by Stebler or Parker or others in 1928 or 1929, it appears inconsistent and unreasonable that the written contract made no mention of any such restriction.

Fred Stebler received 7,500 shares of the stock of the John Bean Manufacturing Co. under the terms of the identical contract by which the decedent received 6,500 shares of the stock. Stebler testified in the instant case, but the record fails to disclose that he was asked or stated anything about the alleged restriction or agreement that the decedent and Stebler were not to sell during 1928 or 1929 any of the John Bean Manufacturing Co. (Food Machinery Corporation) stock acquired by them in the manner heretofore described. Stebler was certainly well qualified to testify as to the existence of any restriction put upon the sale of the stock if such was imposed thereon at the time of its acquisition by him and the decedent.

Viewing the record as a whole, we think, as heretofore stated, that the John Bean Manufacturing Co. (Food Machinery Corporation) stock when received by the decedent in exchange for his Stebler-Parker Co. stock had a fair market value of $35 per share and we are of the opinion and hold that the profit to the decedent on the exchange should be recomputed on that basis instead of $50 per share as determined by the respondent.

With respect to the $10,000 paid in 1922 to George X. Wendling by the decedent Parker for services rendered him in the matter of the organization of the Stebler-Parker Co., which we have held (in 30 B. T. A. 1231, *supra*) was not deductible as an ordinary and necessary expense of carrying on business and which in the instant case is sought to be added to the cost of the decedent's stockholdings in the Stebler-Parker Co. and recognized in determining the profit or loss resulting from the exchange in 1929 of Stebler-Parker Co. stock for John Bean Manufacturing Co. stock, we are of the opinion and hold that the petitioner should be permitted to add that amount to the basis of decedent's Stebler-Parker Co. stock in determining the gain involved in the exchange of Stebler-Parker Co. stock for John Bean Manufacturing Co. (Food Machinery Corporation) stock. *Malta Temple Association*, 16 B. T. A. 409.

*Judgment will be entered under Rule 50*